LIBERTY ASPHALT CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; EDWIN L. FREDERICK and MIRIAM E. FREDERICK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Liberty Asphalt Corp. v. Commissioner
Docket Nos. 19934-80, 19935-80.
United States Tax Court
T.C. Memo 1985-145; 1985 Tax Ct. Memo LEXIS 482; 49 T.C.M. (CCH) 1048; T.C.M. (RIA) 85145; March 27, 1985. Keith F. Bode,Lynne E. McNown, and Paula Cozzi Goedert, for the petitioners. John J. Morrison and Robert F. Simon, for the respondent. GOFFE
MEMORANDUM FINDINGS OF FACT AND OPINION GOFFE, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax as follows: Petitioner Liberty Asphalt Corporation
Additions to Tax
Year
Deficiency
Sec. 6651(a) [1]
Sec. 6653(b)
1969
$31,786.53
$20,244.41
1970
32,291.74
16,145.87
1971
37,553.74
18,776.87
1972
28,969.82
14,484.91
1973
45,299.00
$3,918.10
65,220.00
1974
10,900.63
5,450.32
1975
12,493.67
6,246.84
*483 Petitioners Edwin L. Frederick and Miriam E. Frederick
Additions to Tax
Year
Deficiency
Sec. 6653(b)
1969
$44,110.61
$23,891.31
1970
40,156.98
20,078.49
1971
56,054.39
28,027.19
1972
49,431.67
24,715.84
1973
44,122.19
22,061.09
1974
26,932.76
13,466.38
1975
13,299.40
6,649.70
In motions filed July 29, 1982, respondent moved to sever several issues in the above cases and in Joseph Armondo and Marion Armondo v. Commissioner, docket No. 2556-79 (Armondo), [2] and to consolidate these severed issues for the purposes of trial, briefing and opinion. This Court, upon hearing and argument of the parties, granted respondent's motion to sever in an order dated September 21, 1982. Further, in the same order, this Court granted respondent's motion to consolidate the severed issues in docket No. 2556-79 (Armondo), docket No. 19934-80 (Liberty) and docket No. 19935-80 (Frederick) for purposes of trial. Finally, this Court, in an order *484 dated March 14, 1985, directed that the severed issues in docket No. 19934-80 (Liberty) and docket No. 19935-80 (Frederick) be consolidated for purposes of opinion in order to expendite rendering an opinion to related parties. The severed issues for decision in docket No. 19934-80 (Liberty) are: (1) whether Liberty omitted taxable income on its Federal corporate income tax returns for the taxable years 1969 through 1975, inclusive, in the amounts determined by the Commissioner; (2) whether the statute of limitations bars assessment of the deficiencies determined by the Commissioner for the taxable years 1969 and 1970; and (3) whether Liberty is liable for the additions to tax for fraud under section 6653(b) as determined by the Commissioner. The severed issues for decision in docket No. 19935-80 (Frederick) are: (1) whether the Fredericks omitted taxable income in their joint Federal income tax returns for the taxable years 1969 through 1975, inclusive, in the amounts determined by the Commissioner; (2) whether the statute of limitations bars assessment of the *485 deficiencies determined by the Commissioner for the taxable years 1969 and 1970; and (3) whether the Fredericks are liable for the additions to tax for fraud under section 6653(b) as determined by the Commissioner for the taxable years in issue. FINDINGS OF FACT Some of the facts have been stipulated. The stipulated facts and accompanying exhibits are so found and incorporated herein by reference. Petitioners Edwin L. Frederick and Miriam E. Frederick (hereinafter sometimes referred to as "Mr. Frederick" and "Mrs. Frederick," respectively, or the "Fredericks" collectively), husband and wife for the taxable years in issue, resided in Grayslake, Illinois, when they filed their petition. The Fredericks timely filed joint Federal income tax returns for the taxable years 1969 through 1975, inclusive. Liberty Asphalt Corporation (hereinafter referred to as "Liberty"), formerly known as Liberty Asphalt Products, inc., was incorporated by the Fredericks in Illinois in 1957 and reincorporated in Delaware in 1974. During the taxable years in issue, Mr. Frederick was president and Mrs. Frederick was the secretary and treasurer of Liberty. Each individual owned 34 percent of Liberty's *486 common stock. Liberty's principal place of business at the time its petition was filed was in Grayslake, Illinois. Liberty filed U.S. Corporation Federal income tax returns for the taxable years 1969 through 1975, inclusive. Mr. Frederick began delivering petroleum products to suburban Chicago customers in approximately 1929. In 1945, the Fredericks acquired a petroleum products delivery business from a competitor in the same geographical area, and from thereon, the Fredericks devoted their total efforts to this enterprise. In 1947, the Fredericks' petroleum products delivery business expanded to include specific types of road asphalt repair work. During the taxable years in issue, the Fredericks' incorporated successor enterprise, i.e., Liberty, continued its petroleum products delivery business in addition to performing a variety of asphalt work including the paving and patching of roadways, parking lots and private driveways. During the taxable years 1969 through 1975, inclusive, the Fredericks diverted large sums of Liberty gross receipts to their personal use. Neither the Fredericks nor Liberty maintained complete and accurate records of the amounts of diverted gross *487 receipts. Neither Liberty nor the Fredericks reported the receipt of these diverted amounts on their Federal income tax returns for the taxable years in issue. The diverted gross receipts consisted of cash and checks given by Liberty customers for goods and services delivered and performed. The Fredericks deposited a large percentage of the diverted gross receipts into various personal savings and checking accounts in addition to immediately converting diverted Liberty cash receipts for their own personal use. During the taxable years in issue, the Fredericks deposited at least the following amounts of Liberty gross receipts to their personal banking accounts and did not report the receipt of any part of such sums on their Federal income tax returns: Year
Amount
1969
$31,179.32
1970
39,571.19
1971
69,975.70
1972
64,262.16
1973
61,780.83
1974
28,941.94
1975
15,732.54
Later, the Fredericks redeposited some of these diverted receipts into Liberty's bank account. During the taxable years in issue, the total amounts of unreported Liberty gross receipts which were converted by the Fredericks to their personal use were at least the following *488 sums: Year
Amount
1969
$60,201.77
1970
52,964.21
1971
60,476.20
1972
43,454.43
1973
31,614.92
1974
19,427.70
1975
11,972.14
During the taxable years in issue, the Federicks made numerous cash expenditures including: cash gifts to Liberty's employees; the purchases of drinks and dinners for local governmental officials at conventions in Springfield and Peoria, Illinois; the purchases of meals and refreshments for Liberty's employees; the purchases of lunches for Liberty's auditors; providing their sons, Richard and Edwin L., Jr., with "road expense" funds, i.e., cash, so that they could make numerous expenditures for such items as supplies, refreshments for Liberty's work crews, and customer lunches; providing Mr. Frederick with "road expense" funds; and providing Mrs. Frederick with cash to purchase supplies and to take Liberty's suppliers and customers to lunch. Further, during the taxable years in issue, Mr. Frederick, in his capacity as an officer of Liberty, gave numerous holiday gifts and small cash payments to various local government officials with whom liberty did business. Most government officials who accepted these gratuities received *489 holiday gifts consisting of alcohol, turkeys, condies and assorted novelties. Of the few government officials who accepted cash payments, no single individual received more than $200 in any year in issue. None of the government officials who received any of the above gratuities actively solicited these items from either Mr. Frederick or Liberty; nor did any of these officials have an agreement with Liberty or Mr. Frederick whereby they would accept such gratuities in exchange for defrauding the government entity for which they worked. Mr. Frederick, instead, unilaterally conferred these gratuities upon the officials in order to maintain Liberty's goodwill. In approximately 1974, a Federal Grand Jury was convened in the Northern Judicial District of Illinois to investigate, inter alia, whether numerous local government officials in the Chicago suburbs received bribes from an engaged in "kickback" arrangements with local businessmen. Later, the Internal Revenue Service began its investigation of the attendant income tax consequences of these alleged illegal activities. Beginning in May 1974, Mr. Frederick was interviewed on numerous occasions by Special Agent Michael Anderson *490 of the Internal Revenue Service's Criminal Investigation Division and other Internal Revenue Service employees concerning his participation in the alleged illegal activities. In response to Special Agent Anderson's questions, Mr. Frederick initially denied making any cash payments to local government officials although he did admit distributing small gifts to some local public officials. Soon thereafter, Mr. Frederick retained counsel, and was ultimately granted immunity from prosecution in exchange for his cooperation with investigating authorities. Later, Mr. Frederick appeared before the Federal Grand Jury for the Northern Judicial District of Illinois. Based upon Mr. Frederick's testimony, the grand jury prepared a lengthy and detailed statement describing Mr. Frederick's bribery and "kickback" activities involving local public officials. Mr. Frederick and his counsel reviewed the statement, and Mr. Frederick signed it. On its U.S. Corporation Federal income tax returns for the taxable years in issue, Liberty did not include the gross receipts which the Fredericks diverted to their personal use in its income tax calculations. On their joint Federal income tax returns *491 for the taxable years in issue, the Fredericks did not report the Liberty gross receipts which they converted to their personal use. In a notice of deficiency dated July 30, 1980, the Commissioner determined that Liberty had the following amounts of unreported sales and receipts: Year
Amount
1969
$60,201.77
1970
52,964.21
1971
60,476.20
1972
43,454.43
1973
31,614.92
1974
19,427.70
1975
11,972.14
The Commissioner also determined that all or part of the underpayment of tax required to be shown on Liberty's returns for the taxable years in issue was due to fraud; hence, he imposed additions to tax under section 6653(b). In a notice of deficiency dated July 30, 1980, the Commissioner determined that the Fredericks had the following amounts of unreported income: Year
Amount
1969
$66,344.95
1970
58.736.73
1971
86,938.11
1972
74,858.83
1973
64,145.33
1974
38,147.35
1975
16,732.64
The source of the unreported income was not specified in the notice of deficiency although it did state that these amounts were deposited in the Fredericks' bank accounts. Further, the Commissioner determined that all or part of the underpayment *492 of tax required to be shown on the Fredericks' joint Federal income tax returns for the taxable years in issue was the result of fraud; hence, he imposed additions to tax under section 6653(b). OPINION The first issue for decision is the unreported income of the petitioners. As none of the petitioners have either contended or shown the Commissioner's determinations to be "arbitrary or excessive," the traditional presumption of correctness attaches to the Commissioner's determinations and petitioners bear the burden of proving such determinations were, in fact, erroneous. ; ; Rule 142(a). Petitioners admit that during the taxable years in issue, large sums of Liberty gross receipts were deposited in the Federicks' personal checking and savings accounts. Petitioners contend, however, that the following scenario occurred: Mr. Frederick, in his capacity as an officer of Liberty, was simultaneously approached in 1969 by numerous local government officials with whom Liberty did business. These public officials demanded substantial cash payments if Liberty *493 was to continue to do business with the respective government entities. At the request of these public officials, Liberty made fictitious or excessive billings to these government customers to generate the necessary funds for the payoffs. Certain receipts from Liberty customers were deposited into the Fredericks' personal bank accounts and were ultimately used, along with personal funds, by Mr. Frederick to make the payoffs, which allegedly totalled over $300,000 during the taxable years in issue. Petitioners rely on the "claim of right" doctrine as enunciated in , which held that the receipt of funds by a taxpayer does not constitute income unless received "under a claim of right and without restriction as to its disposition." Petitioners, therefore, assert that they had no taxable income as they were merely "conduits" for payoffs actually made during the taxable years in issue. Petitioners find support for their position in , and other decisions [3] in which the "conduit" theory was applied to absolve taxpayers of *494 unreported income in factual scenarios similar to the one alleged by petitioners. Respondent asserts that the vast majority of the alleged cash payoffs did not occur. In support thereof, respondent observes numerous and significant inconsistencies in petitioners' claims, including: contradictory statements of Mr. Frederick as who was paid, how much as paid, when it was paid; the fact that several of the alleged payoff recipients were not in office or were dead when the alleged payoffs took place; the implausibility of several facets of the entire scenario concerning whether sufficient funds could actually be obtained *495 by the methods described to make the alleged payoffs totaling $304,800 during the taxable years in issue; and the absence of credible corroborating evidence of the entire alleged scenario. Respondent further asserts that petitioners' "conduit" claim must also fail because they have not proven an essential element of such theory: pre-existing agreements for kickbacks in exchange for contracts. , affd. . After thoroughly reviewing the voluminous and detailed record in these consolidated cases, we conclude that petitioners have failed in carrying their burden of proving the Commissioner's unreported income determinations to be erroneous. Rule 142(a). The only allowance we will afford the petitioners is that the amounts of unreported income during the taxable years in issue, all of which arise from unreported receipts of Liberty converted by the Fredericks to their personal use, should be the same for both the Fredericks and Liberty. We are convinced, however, that both the Fredericks and Liberty omitted taxable income in at least the lesser amounts determined against Liberty *496 for the taxable years in issue. No satisfactory explanation for the differences in unreported income between the Fredericks and Liberty was offered by respondent; hence, the lesser amounts determined by the Commissioner against Liberty appear reasonable and consistent with the evidence produced with respect to the amounts of omitted income by the Fredericks for the taxable years in issue. Accordingly, we hold that both the Fredericks and Liberty omitted at least the following amounts of taxable income during the taxable years in issue: Year
Amount
1969
$60,201.77
1970
52,964.21
1971
60,476.20
1972
43,454.43
1973
31,614.92
1974
19,427.70
1975
11,972.14
With respect to the bases for our holdings, an excellent beginning point is an examination of Mr. Frederick's varying claims as reflected in the record. The record contains several recapitulations by Mr. Frederick of the alleged payoffs made. He initially denied making any payoffs. In his grand jury statement, answers to interrogatories, and testimony at trial, Mr. Frederick claimed he made cash payments to as few as 10 and as many as 50 local public officials. Only a few of the alleged amounts *497 of payments, dates and places of payment, or sources of payment funds coincide in these recapitulations. Further, when Mr. Frederick's claims are viewed in light of various official records, he apparently was paying large numbers of individuals who were either dead or not currently holding public office. Viewed in the very best light, Mr. Frederick's recapitulations are completely contradictory, evasive and can best be characterized as total falsehoods concocted to protect his wallet. Further, this is amply confirmed by our observation of his demeanor while testifying. We accord no weight to his testimony and if he were to remark that it is noon, any reasonable person would seek independent corroborating evidence of that statement before relying upon it. Mr. Frederick's bribery and kickback scenario was also not confirmed by the local government officials who testified at trial. Although many of these witnesses acknowledged that they received small unsolicited holiday gifts, only a handful of officials stated that they received small amounts of cash during the taxable years in issue, and even then, all of them testified that the cash was unilaterally conferred upon them by Mr. *498 Frederick. None of the officials corroborated Mr. Frederick's claims of pre-existing agreements for kickbacks in exchange for contracts. While a lack of candor on this subject by these public officials is consistent with human nature, petitioners can hardly be seen to have carried their burden of proof in light of our prior reflections on Mr. Frederick's ability to truthfully relate what really occurred. Although petitioners' remaining witnesses did, in fact, corroborate Mr. Frederick's claim that some cash payments were made, there still is an overwhelming dearth of credible corroborating evidence that large amounts of cash were paid to local government officials pursuant to pre-existing kickback agreements during the taxable years involved. For example, James Badgerow, who was the assistant to Mr. Frederick at Liberty during the taxable years involved, and is no longer associated with Libery, corroborated the fact that some small cash payments were made but he had no personal knowledge of pre-existing kickback agreements during the taxable years in issue. Further, Mr. Badgerow also acknowledged that he had made materially false statements in an affidavit relating to the alleged *499 "kickback" scheme; hence, his testimony is entitled to little weight. Although petitioners introduced evidence of the Fredericks' repayment of some of the diverted Liberty gross receipts, we are confident that respondent's employees who assisted in the preparation and presentation of these cases afforded petitioners every reasonable benefit of doubt, subject to the minor adjustment we have already addressed. In general, they did an exemplary job of wading through a confusing mass of detailed records. Further, it was established at trial that an undetermined yet substantial amount of Liberty cash receipts which were diverted by the Fredericks to their personal use were not recorded in Liberty's books and records, and these sums were not included in the Commissioner's determinations. When the large amounts of unrecorded Liberty cash receipts which the Fredericks diverted to their personal use are integrated into the calculations, we again feel confident that petitioners omitted atleast the amounts of taxable income set forth above for the taxable years in issue. Finally, we observe that petitioners did not maintain accurate and complete books and records of Liberty's *500 real total receipts or the amounts of Liberty's gross receipts which the Fredericks' converted to their personal use during the taxable years in issue. There is, of course, no legal or legitimate business justification for failing to maintain accurate and complete books and records of an enterprise's gross receipts. The same can be said with respect to the Fredericks' direct deposit of Liberty gross receipts into their personal banking accounts, especially in the absence of detailed supporting records. It is in this context, therefore, that petitioners must begin their showing that the Commissioner's determinations are erroneous. Once petitioners' "conduit" claims were shown to be baseless, they could, at most, offer bits and pieces of incomplete and uncertain financial information attempting to show that the monies in issue were repaid or included in their taxable income. Petitioners' difficulties were compounded by their admissions that they converted to their personal use, an undisclosed amount of Liberty cash receipts during the taxable years in issue which were not included in the Commissioner's determinations. It should come as no surprise, therefore, that these petitioners *501 failed to carry their burden of proving the Commissioner's unreported income determinations to be erroneous. Accordingly, subject to the minor adjustment previously identified, the Commissioner's determination of unreported income is sustained. The next issue for decision is whether petitioners are liable for the additions to tax under section 6653(b) for fraud. The burden of proving fraud is on respondent, and he must do so by clear and convincing evidence. Rule 142(b); sec. 7454(a); . This burden is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of taxes and that there is an underpayment of tax. , cert. denied ; ; . When fraud is determined, as in the instant case, for more than one taxable year, respondent must show that some part of an underpayment was due to fraud for each *502 taxable year for the corresponding addition to tax to be upheld. ; . The existence of fraud is a question of fact to be resolved upon consideration of the entire record. ; , affd. without published opinion . Fraud will never be presumed. . Since fraud can seldom be established by direct proof, the requisite intent may be inferred from a showing by respondent that petitioner's conduct was intended to conceal, mislead or otherwise prevent the collection of taxes that petitioner knew or believed he owed. ;Since respondent's determination of fraud requires an inquiry into the taxpayer's frame of mind, a single act or omission seldom demonstrates the necessary fraudulent intent. Rather, the existence *503 of the requisite fraudulent intent must generally be determined by surveying a taxpayer's entire course of conduct. ; . With respect to the Fredericks, respondent has satisfactorily proven by clear and convincing evidence underpayments for the taxable years in issue and sufficient indicia of fraud as to some part of such underpayments.We have already examined and rejected petitioners' "conduit" claims concerning the deposit of substantial amounts of Liberty gross receipts into the Fredericks' personal bank accounts; hence, no reasonable explanation of this unusual business scenario exists. Petitioners did not include the diverted funds in their taxable income for the taxable years in issue. Such consistent substantial omissions of income, without more, support the inference of willfully fraudulent conduct. ; , affg. a Memorandum Opinion of this Court. Further, the Fredericks did not maintain accurate books and *504 records concerning their diversion of substantial amounts of Liberty gross receipts (including an undetermined amount of cash) to their own personal use during the taxable years in issue, which is another indicia of an attempt to defraud the taxing authorities. . Finally, the Fredericks engaged in misleading conduct during the investigation of their Federal income tax liabilities for the taxable years in issue. They falsely claimed to have made substantial cash payments to various public officials during the years in issue. Although we acknowledge that the Fredericks unilaterally made several small cash payments to a handful of local government officials during the years in issue, petitioners falsely inflated both the number of officials involved and the amounts of payments in addition to concocting an unbelievable "kickback" scheme in an attempt to defraud the taxing authorities. Such conduct, the likely effect of which would be to mislead or to conceal their true activities from the taxing authorities, is clearly evidence of the Fredericks' fraudulent conduct during the taxable years in issue. . *505 Accordingly, the Commissioner's determination that the Fredericks are liable for the fraud additions to tax under section 6653(b) for the taxable years in issue is sustained. Rule 142(b). The same conclusion is also warranted with respect to the Commissioner's determination concerning the fraud additions to tax under section 6653(b) for Liberty for the taxable years in issue. We have already examined and rejected petitioners' "conduit" claims concerning the deposit of substantial amounts of Liberty gross receipts to the Fredericks' personal bank accounts; hence, no reasonable explanation of this unusual business scenario exists. The Fredericks also converted large amounts of Liberty cash receipts to their personal use during the years in issue. Liberty did not include these amounts in its taxable income for the taxable years in issue. Such consistent omissions of income, without more, support the inference of willfully fraudulent conduct. ;
During the years in issue, Liberty did not maintain accurate books and records concerning the diversion of substantial amounts *506 of its gross receipts to the Fredericks which is another indicia of an attempt to defraud the taxing authorities. Further, Liberty's officers made substantial cash expenditures during the years in issue which, in this context, is additional evidence of fraudulent activity. Finally, Liberty, through its officers, the Fredericks, engaged in misleading conduct during the investigation of its tax liabilities. Liberty falsely claimed to have made substantial cash payments to various public officials during the years in issue. Although we acknowledge that the Fredericks unilaterally made several small cash payments to local government officials during the taxable years in issue, petitioners falsely inflated both the number of involved officials and the amounts of payment in addition to concocting an unbelievable "kickback" scheme in an attempt to defraud the taxing authorities. Such conduct, the likely effect of which would be to mislead or to conceal their true activities from the taxing authorities, is clearly evidence of Liberty's fraudulent conduct during the taxable years in issue. *507 Accordingly, the Commissioner's determination that Liberty is liable for the fraud additions to tax under section 6653(b) for the taxable years in issue is sustained. Rule 142(b). The final issue for decision is whether the statute of limitation bars assessment of the deficiencies against the Fredericks and Liberty for the taxable years 1969 1970. We have already decided that both the Fredericks and Liberty fraudlently underpaid their Federal income tax for the taxable years 1969 and 1970. Section 6501(c)(1) provides in such instances that the tax may be assessed at any time. Accordingly, the statute of limitation does not bar assessment of additional Federal income tax against petitioners for the taxable years 1969 and 1970. Sec. 6501(c)(1). An appropriate order will be entered.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, and all rule references are to this Court's Rules of Practice and Procedure.↩
2. See , filed this date.↩
3. Petitioners specifically cite the following decisions of this Court: ; ; ; ; ; ; ; .↩